## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:19-CR-00299 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| EDWARD MICHAEL PARKS | ) | AUGUST 16, 2023 |

### MEMORANDUM OF DECISION
### RE: MOTION FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY FOR A NEW TRIAL [ECF NO. 149]

Kari A. Dooley, United States District Judge:

Following a jury trial, Defendant Edward Michael Parks ("Parks") was convicted of two counts of kidnapping resulting in death in violation of Title 18 United States Code § 1201(a)(1), and one count of witness tampering by killing in violation of Title 18 United States Code §§ 1512(a)(1)(C) & 1512(a)(3)(A).  Pending before the Court is Parks' post-trial motion for judgment of acquittal or alternatively for a new trial pursuant to Rules 29[1] and 33 of the Federal Rules of Criminal Procedure. For the reasons set forth below, the motion is DENIED.

### I.    Procedural History

On December 9, 2019, a grand jury returned an indictment against Parks charging him in Count One with kidnapping resulting in the death of Damian Connor, in Count Two with kidnapping resulting in the death of Tamar Lawrence, and in Count Three with witness tampering by killing arising out of the shooting death of Devante Williams. Jury selection was held on January 4 and January 5, 2023. The jury heard evidence over the course of six days commencing on January 9, 2023, and on January 19, 2023, returned a guilty verdict as to all Counts.

---

[1] At the conclusion of the Government's case-in-chief, Parks made an oral motion for a judgment of acquittal. *See* Oral Mot. for Acquittal, ECF No. 111. The Court reserved decision and thereafter, Parks supplemented his motion through a written motion and briefing. *See* Mot. for Acquittal, ECF No. 149.

## II.    Standard of Review - Motion for Judgment of Acquittal

"Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. A defendant who challenges the sufficiency of the evidence to support his conviction bears a heavy burden. Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (cleaned up).

When evaluating the sufficiency of the evidence, courts must "bear in mind that the jury's verdict may rest entirely on circumstantial evidence." *Id.* "When making a case based on circumstantial evidence, the government need not exclude every reasonable hypothesis other than that of guilt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)). Moreover, "it is the task of the jury, not the court, to choose among competing inferences." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). Rule 29 does not provide the trial court with an opportunity to "substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984); *accord United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016). Thus, "the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna*, 183 F.3d at 130 (internal quotation marks omitted).

## III.    Standard of Review - Motion for a New Trial

Rule 33 provides that the district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). "In other words, there must be a real concern that an innocent person may have been convicted" for the ordering of a new trial to be appropriate. *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (cleaned up).

With these legal principles in mind, the Court turns to the merits of Parks' motion.

## IV.    The Evidence at Trial[2]

In November of 2015, Parks was living at 21 Shelton Avenue in New Haven, Connecticut with his then-girlfriend Tameika Covington. Ms. Covington testified that a number of her family members also resided at the residence. On November 16, 2015, Parks, who was a high-ranking member of a national street gang, was conducting an illegal gun sale at the residence. Present at various times during the sale were Lavontaye Covington, Jose Covington, Laquasia Samms, Rayquan Carr, Tamar Lawrence, Damian Connor, Devante Williams, Erick Gomez, and Ronald

---

[2] The Court's summary of the evidence does not include, or attempt to include, all of the evidence on which the jury might have reasonably relied in reaching its verdict.

Coleman.[3] Damian Connor, a potential customer for the gun sale, was at the residence with Tamar Lawrence. Erick Gomez, who had learned about the guns for sale from Lavontaye Covington, went to the residence not for the purpose of buying guns, but with the intention of stealing guns. Ultimately, Gomez took two guns from the residence without paying for them. During the sale, Parks was armed with two guns, which were visible in his sweatshirt pocket. When Parks learned that Gomez had taken two guns without paying for them, he told Connor and Lawrence that they were not going anywhere until he got either his guns back or money for the guns. The witnesses who were present testified that Connor and Lawrence looked nervous and/or scared.

At this point, the evidence was clear that multiple people, to include Connor and Lawrence, were calling Gomez to get him to return or pay for the guns. Lavontaye Covington left the apartment and went to the home of Quantasia Brown,[4] Gomez's girlfriend, in an effort to find Gomez. Gomez testified that multiple people called him, that Connor and Lawrence begged him to come back, and that they sounded shaken and worried. Gomez was told that if he did not return the guns, Parks was going to harm Connor and Lawrence. Jose Covington testified that Gomez was told he had until 7:00 p.m. to return the guns. Gomez did not return the guns. The evidence is consistent across witnesses that it was clear that Connor and Lawrence were not free to leave the residence.

At some point after the 7:00 deadline had passed, Jose Covington testified that Parks told Connor and Lawrence, "time's up." Connor told Parks that he could get money to pay Parks for the guns. Parks then told Connor, Lawrence, Carr, Jose Covington, and Devante Williams that they were "going for a ride." Carr testified that Parks told him to come with him in Connor's vehicle, which he did. Connor drove the vehicle while Parks, who was still armed, sat in the front passenger

---

[3] Jose Covington, Rayquan Carr, Tameika Covington, and Erick Gomez testified at trial.
[4] Ms. Brown testified at trial.

seat. Carr was in the back seat behind Connor and next to Lawrence. Jose Covington and Devante Williams followed in Laquasia Samms' vehicle. Carr testified that they went to a home in a rural area. Once there, Connor got out of the vehicle and went into the home. Lawrence stayed in the vehicle with Parks and Carr. When Connor returned, Parks instructed him to drive to the parking lot of the Broadmoor Apartment Complex in Hamden, Connecticut. Carr testified that upon arriving at the Broadmoor apartment complex Connor gave Parks money and stated that it was all he had.

Meanwhile, Jose Covington had lost sight of Connor's vehicle and his cell phone ran out of power, so he went to his father's house to quickly charge his phone so he could reach Parks. When he was able to contact Parks, Parks directed him to the Broadmoor Apartment Complex. Jose Covington drove to the parking lot and parked a few spots away from Connor's vehicle. Jose Covington testified that: he then saw several muzzle flashes from inside Connor's vehicle; Carr exited the vehicle from the back seat;[5] Carr ran towards the vehicle Jose Covington was driving, dropping something (perhaps a phone) along the way; Parks got out of the front passenger seat of Connor's vehicle;[6] Parks wiped down the passenger door area with his shirt; and when Parks got in the vehicle Jose Covington was driving, Parks told him to "drive regular." Once in the vehicle, Parks told Carr to get rid of the cell phones that had been taken from Connor and Lawrence. Carr wiped down the phones and threw them out of the vehicle's window.[7]

---

[5] Consistent with this and Carr's testimony, Carr's DNA profile was included in a swabbed DNA sample collected from the rear driver's-side handle of Connor's vehicle.

[6] Consistent with this and Carr's testimony, Parks could not be eliminated as the source of a hair retrieved from the front passenger seat of Connor's vehicle, with an expected frequency of such a conclusion being less than one-in-seven-billion people.

[7] Tamar Lawrence's phone was found by Charles Daniels, a resident of Hamden, while walking his dog. When the phone kept receiving calls and texts, Daniels became concerned that something bad had happened to the phone's owner so he turned it into the Hamden Police Department.

Rayquan Carr testified that after Connor gave Parks the money, Parks pulled out his .38-caliber revolver[8] and shot Connor in the head and then turned in his seat and shot Lawrence multiple times in the head.[9] Carr then ran from the vehicle. When Parks and Carr were both in the vehicle being driven by Jose Covington, Devante Williams questioned Parks—"What are you doing?" "What's going on?"

Carr and Jose Covington both testified that they returned to the Shelton Avenue residence, where Covington got out of the vehicle. Parks wanted him to keep driving but Covington refused. Covington testified that he got out of the vehicle because he feared he would be the "next victim." Before he left with Carr and Williams, Parks said to Covington, "[y]ou didn't see nothin." Parks told Carr to drive and told Carr and Williams that they were going to go smoke marijuana. Carr testified that before they left, Jose Covington gave Parks a large silver gun, which he thought was a .45 caliber.

 At Parks' instruction, Carr drove to an apartment complex a few minutes away in New Haven, Connecticut. Carr parked the vehicle and Carr, Parks, and Williams exited the vehicle. Carr testified that just as he and the others were getting out of the vehicle, Parks shot Williams, who fell to the ground but then got up and began running from Parks. Carr testified that he stayed with the vehicle as Parks chased Williams around the building and out of his sight. He thereafter heard additional gun shots. Carr turned the vehicle around and when Parks returned, he drove the vehicle back to the Shelton Avenue apartment.

Witness Kelly Riley testified that she was on her balcony overlooking the parking lot to which Carr had driven Parks and Williams. She testified that she observed a person with "dreads"

---

[8] No shell casings were recovered at the scene, which is consistent with a revolver being the gun used to kill Connor and Lawrence.
[9] The testimony is consistent with the medical examiner's findings.

shoot another person, that the person who was shot fell down but then got up and ran, and that the shooter followed the victim as he ran behind the apartment building. She called 911 to report what she had seen.

When Carr and Parks arrived at the Shelton Avenue apartment building, Parks returned to Tameika Covington's apartment while Carr gave Lawrence Fredericks a ride. Then Carr, too, returned to the apartment. When he returned, Parks had changed his clothes. Parks handed Carr a bag containing the clothes he had been wearing and told him to burn them. Carr, instead, threw the bag in a dumpster and left for his girlfriend's house.

Jose Covington testified that when Parks returned to the apartment he changed his clothes. He further testified that he heard Parks washing up and that he smelled bleach. He testified that Parks told him in detail about how he shot Williams, including that after Parks shot him, Williams "hopped back up;" Williams questioned why Parks shot him; and that Parks ran out of bullets in the .38-caliber and had to use the "other gun."[10] Tameika Covington testified that Parks immediately began packing upon his return to the apartment and that he told her he "could not go to jail." Parks and Tameika Covington then went to Parks' sister's home in New Haven for the remainder of the night. In the morning, Tameika Covington testified that Parks gave a gun to his sister and told her to throw it in the river. She further testified that a vehicle with out-of-state license plates arrived and Parks left immediately in the vehicle. Lastly, Tameika Covington testified that Parks told her that he did not also kill Jose Covington because he was her son and he knew that she loved him.

---

[10] Covington's testimony regarding Parks' admission is consistent with Carr's testimony and Riley's testimony. In addition, the evidence from the crime scene included .45-caliber shell casings, consistent with the second gun being used to kill Williams.

Kevin Lott testified that he is a member of the same gang as Parks. He further testified that Parks called him on the night of November 16, 2015 and asked him to drive to Connecticut from North Carolina to pick him up. Lott drove through the night, picked Parks up the following morning, and immediately returned with Parks to North Carolina.[11]

During the investigation, after Parks was developed as a suspect, Special Agent Lisa MacNamara travelled to North Carolina to interview Parks. She showed him pictures of Tameika Covington, Damian Connor, Erick Gomez, Jose Covington, Rayquan Carr, and Lavontaye Covington. He denied knowing any of them.

## V.   Discussion

### A.  Motion for Judgment of Acquittal

Parks first argues that Court should enter a judgment of acquittal because there was insufficient evidence to support his conviction. *See* Def.'s Mem. in Supp. Mot. for Acquittal and New Trial ("Def.'s Mem. in Supp.") at 4–16, ECF No. 149-1.

The jury was instructed that, in order for Parks to be found guilty on Count One, kidnapping resulting in the death of Damian Connor, the Government would have to prove beyond a reasonable doubt the following:

> **First**, that Mr. Parks seized, confined, inveigled, kidnapped, abducted or carried away Damian Connor;
>
> **Second**, Mr. Parks held Damian Connor for ransom[;]
>
> **Third**, Mr. Parks used any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense;
>
> **Fourth**, Mr. Parks acted unlawfully, knowingly, and willfully; and
>
> **Fifth**, Mr. Parks' acts resulted in the death of Damian Connor.

---

[11] This testimony was corroborated by cell-site analysis of Parks' phone and Lott's phone.

Jury Instructions at 7–8, ECF No. 118. With regard to Count Two, charging Parks with kidnapping resulting in the death of Tamar Lawrence, the Court instructed the jury that "[t]he elements that the Government must prove beyond a reasonable doubt for Count Two are the same as the elements of Count One except that in Count Two, the identified victim is Tamar Lawrence." *Id.* at 12. As to Count Three—Witness Tampering by Killing—the jury was instructed that the Government was required to prove beyond a reasonable doubt the following:

> **First**, that the Defendant unlawfully killed Devante Williams.
>
> **Second**, that the intent of the killing was to prevent the communication by Devante Williams to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a federal crime, that is, the kidnapping and killing of Damien Connor and Tamar Lawrence.

*Id.* at 13.

Parks advances three primary arguments in support of his motion for judgment of acquittal. First, that based on the evidence put forth at trial, it was more likely that Rayquan Carr shot and killed all three victims, and therefore that no reasonable juror could have concluded beyond a reasonable doubt that Parks committed these crimes. *See* Def.'s Mem. in Supp. at 4–6. Second, as to Counts One and Two, that there was insufficient evidence that the deaths of Connor and Lawrence were the result of any kidnapping because, even if they had been kidnapped, the kidnapping was over by the time Connor and Lawrence were shot. *See id.* at 6–10. Finally, as to Count Three, Parks argues that there was insufficient evidence to satisfy the "federal nexus" element of witness tampering. *See id.* at 10–16.

### *All Counts—Parks' Involvement in the Murders*

Each of Parks' arguments are premised on an alternative view of the evidence, not a required view of the evidence. As to his first argument, although Parks argued to the jury that Rayquan Carr shot and killed Connor, Lawrence, and Williams, the jury was free to reject that

argument. As discussed above, Carr testified that Parks shot and killed all three victims, testimony the jury is entitled to credit. And Carr's testimony was corroborated by Kelly Riley, who witnessed the shooting of Williams. She saw a shooter with dreadlocks shoot someone, who then got up and ran, only to be followed by the shooter. Carr's testimony is also corroborated in several respects by the testimony of Jose Covington, as well as by forensic evidence collected at each crime scene. Jose Covington testified that Parks wiped down the front passenger door of Connor's vehicle after he saw the muzzle flashes and saw Carr exit the rear of the vehicle; that Parks acknowledged killing Williams; and that Parks cleaned up with bleach and then immediately left the Shelton Avenue apartment. Tameika Covington testified that Parks told her that the reason he did not also kill Jose Covington was because he was her son and he knew that she loved him. After the murders, Parks gave his clothes to Carr and instructed him to burn them, gave a gun to his sister and told her to dispose of it, and called a fellow gang member to direct him to drive immediately from North Carolina to Connecticut and give him a ride back to North Carolina. In sum, there was ample evidence that Parks shot and killed Connor, Lawrence, and Williams.[12]

---

[12] Moreover, as addressed *infra* in the context of Parks' motion for a new trial, the jury was not required to find that Parks was the person who shot and killed Connor and Lawrence in order to find him guilty of Counts One and Two. Rather, the jury was only required to find that Parks kidnapped the victims and that, but for Parks' actions, the victims would not have died. While the Government argued, as a factual matter, that Parks shot Connor and Lawrence, making that argument did not elevate the Government's burden. *See, e.g.*, *Musacchio v. United States*, 577 U.S. 237, 243 (2016) ("[W]hen a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction."). And here, a reasonable juror could certainly find that the evidence sufficiently established that Parks kidnapped the victims and but for that conduct, they would not have died. The conclusion is almost axiomatic under the circumstances of this case. *See United States v. McGowan*, No. 15-20007-JAR, 2018 WL 4095939, at *9 (D. Kan. Aug. 28, 2018) (finding "[t]he fact that someone else may have shot the victim . . . simply not relevant" because the defendant's "claimed version of events still support[ed] a conclusion that the kidnapping resulted in the minor victim's death" and the "if death results" sentencing enhancement of section 1201(a) "does not require an intent-to-kill element"); *United States v. Fell*, No. 5:01-CR-12-01, 2017 WL 10809986, at *4 (D. Vt. Mar. 21, 2017) ("There is no intent element associated with the fourth element of death resulting. . . . If the other elements are present and the victim dies through accidental means, the element would be satisfied. There is no requirement that the defendant specifically intend to kill the victim or that he take purposeful action resulting in death.").

***Counts One and Two—Kidnapping Resulting in Death***

Parks' next argument is equally unavailing. In support of this argument, Parks suggests that the evidence was insufficient to establish that Connor and Lawrence had been kidnapped at all. *See* Def.'s Mem. in Supp. at 6–7. Parks then goes on to argue that, even if they had been kidnapped, the kidnapping ended before Connor and Lawrence were shot and killed, as evidenced by Connor driving to his house, getting out of the vehicle by himself, and subsequently returning to the vehicle of his own volition. *See id.* at 7–10.

There was ample evidence from which the jury could conclude that Connor and Lawrence were kidnapped and not free to leave at any point leading up to their deaths, both at the apartment and in Connor's vehicle once they left the apartment. Each witness testified that everyone who was present at the apartment understood that Connor and Lawrence were being held and threatened with harm in order to get Gomez to return the guns or pay for the guns. There was testimony that a deadline was communicated to Gomez. There was testimony that once the deadline passed, Parks directed that they would be "going for a ride." Parks was armed. At Parks' direction, Carr rode with Parks, Connor, and Lawrence, and Jose Covington followed with Devante Williams. Parks sat in the front seat with Connor driving. Lawrence was, at all times, in the back seat. When they drove to the Hamden home, Connor did exit the vehicle by himself, but his friend, Lawrence remained in the vehicle with Parks (again, who was armed) and Carr. Thereafter, Connor gave Parks money, from which a reasonable jury could draw an inference that he was trying to buy his and Lawrence's freedom. Given the nature of the threat to Connor and Lawrence if the guns were not returned or paid for, and in light of the fact that Gomez did neither, a reasonable inference to be drawn is that the events put into motion with their initial seizure continued until the time of their deaths.

### Count Three—Witness Tampering

Parks also challenges the sufficiency of the evidence as to Count Three. He argues that the evidence did not establish that Devante Williams was killed in order to prevent him from communicating with *federal* law enforcement regarding the murders of Connor and Lawrence as required for a conviction under Section 1512(a)(1)(C). *See* Def.'s Mem. in Supp. at 10–16.

On this issue, the jury charge derived largely from *Fowler v. United States*, 563 U.S. 668 (2011). In *Fowler*, the Supreme Court held that a defendant who does not intend to interfere with a communication to *federal* law enforcement, specifically, may still be found to have violated Section 1512 "if it [was] reasonably likely under the circumstances that . . . at least one of the relevant communications would have been made to a federal officer." *Id.* at 677–78. "This standard is a relatively low bar." *United States v. Tyler*, 956 F.3d 116, 126 (3d Cir. 2020) (internal quotation marks omitted). A "reasonable likelihood" need not even be "more likely than not," but it must be "more than remote, outlandish, or simply hypothetical." *Id.*

"*Fowler* 'le[ft] it to the lower courts to determine whether, and how, the ["reasonable likelihood"] standard applies' to the conduct at issue in that case." *United States v. Veliz*, 800 F.3d 63, 74 (2d Cir. 2015) (quoting *Fowler*, 563 U.S. at 678). Prior to *Fowler*, the Second Circuit had held that to satisfy the federal nexus requirement under § 1512(a)(1)(C), "the government must adduce evidence from which a rational juror could infer that the victim *plausibly* might have turned to federal officials." *Id.* (quoting *United States v. Lopez*, 372 F.3d 86, 92 (2d Cir. 2004), *vacated and remanded on other grounds*, 544 U.S. 902 (2005)). "That burden could be carried by showing that the conduct which the defendant believed would be discussed in these communications constitutes a federal offense, so long as the government also presents additional appropriate evidence." *Id.* (quoting *Lopez*, 372 F.3d at 91). In *Lopez*, the Court of Appeals did not comprehensively define "additional appropriate evidence," because "by its nature [it] will require

careful, case-by-case analysis." *Id.* (quoting *Lopez*, 372 F.3d at 91). But the court cited "as examples of such evidence 'proof that there was a federal investigation in progress at the time' of the witness tampering, or 'that the defendant had actual knowledge of the federal nature of the offense.'" *Id.* (quoting *Lopez*, 372 F.3d at 91).

The Second Circuit concluded in *Veliz* "that the 'federal offense' plus 'additional appropriate evidence' framework remains valid in light of *Fowler*," and thus continues to follow that framework. *Id.* at 74–75. "While *Fowler* may have increased the likelihood that must be demonstrated, it does not follow that a 'reasonable likelihood' cannot be shown through the same means that we previously permitted 'plausibility' to be shown." *Id.* at 75.

Parks contends that the Government failed to meet this standard because murder is a quintessential state crime with no obvious connection to federal law enforcement. *See* Def.'s Mem. in Supp. at 14–15. Thus, he argues that he could not have anticipated that the murders would be investigated by federal authorities, thereby defeating any claim that he murdered Devante Williams in an effort to prevent communication with federal authorities. *See id.*

The Court concludes that sufficient evidence supports the jury's finding that Williams' communication with federal law enforcement was reasonably likely. First, the kidnappings that resulted in the deaths of Connor and Lawrence were, in fact, federal offenses. Next, there is little dispute that the kidnappings that resulted in the deaths of Connor and Lawrence derived from the theft of firearms during an illegal firearms sale being conducted by Parks. Parks was aware that firearms-related offenses are prosecuted by federal authorities because he himself had previously been prosecuted by federal authorities in connection with his alleged illegal possession of a firearm.

Moreover, Special Agent MacNamara testified that Devante Williams would have been an important witness and someone the FBI would certainly have wanted to talk to during the investigation into the deaths of Connor and Lawrence. Although the Hamden and New Haven Police Departments were the primary investigating agencies at the outset, the FBI was offering assistance from early in the investigation and eventually became more involved as the murders remained unsolved. Although the Court is mindful of *Fowler*'s caution against "transform[ing] a federally oriented statute into a statute that would deal with crimes, investigations, and witness tampering that, as a practical matter, are purely state in nature," 563 U.S. at 677, given the circumstances of this case, the jury had sufficient evidence to determine that it was reasonably likely that Williams would have communicated what he witnessed with respect to the deaths of Connor and Lawrence to federal law enforcement. The Government offered sufficient "additional appropriate evidence," rendering this likelihood well "more than remote, outlandish, or simply hypothetical." *Id.* at 671, 678.

Accordingly, the Court finds that the jury's conviction of Parks on all three counts was supported by sufficient and substantial evidence, and Parks' motion for acquittal is denied.

### B.  Motion for a New Trial

Alternatively, Parks seeks a new trial, and, in so doing, identifies error in the Court's jury instructions as well as the Court's response to the jury's note regarding the causation aspect of Counts One and Two.[13] *See* Def.'s Mem. in Supp. at 18–26. Parks alleges a violation of his due

---

[13] Parks also argues that the Court should exercise its discretion under Rule 33 to grant him a new trial in order to prevent a miscarriage of justice due to the "weaknesses and inconsistencies associated with the testimony about Mr. Parks' role in the shootings, and the failure to prove the other essential elements of the kidnapping and tampering charges." Def.'s Mem. in Supp. at 18 (capitalization omitted). As discussed above, the Court finds that the evidence was more than "minimally sufficient" to support Mr. Parks' convictions on all three Counts, and therefore does not find that a new trial is necessary to prevent manifest injustice on the basis of the sufficiency of the evidence. *See Sanchez*, 969 F.2d at 1414 ("It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.").

process rights insofar as the Court allowed the jury to convict him on Counts One and Two on a theory not advocated by the Government during its case-in-chief. *Id.* at 19–23.

### *Counts One and Two—Causation*

Parks seeks a new trial on the ground that the Court's jury instruction as to the requisite proof of causation required as to Counts One and Two was error. *Id.* at 23–25. In the jury instructions, the Court charged the jury that "[t]o establish that the Defendant's conduct resulted in the death of [the victim], the Government must prove beyond a reasonable doubt that but for the Defendant's actions, [the victim] would not have died." Jury Instr. at 11. Parks argues that this instruction was legally incorrect insofar as it did not include a "proximate cause" component— specifically, a charge that the death of the victims had to have been reasonably foreseeable to Parks. *See* Def.'s Mem. in Supp. at 23–25. Parks relies principally on *Burrage v. United States*, a case in which the Supreme Court held that, in order to impose the "death-results" penalty enhancement in the Controlled Substances Act, the Government must show at least but-for causation. *See* 571 U.S. 204, 219 (2014). The *Burrage* Court also stated in dicta that, "[t]he law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause." *Id.* at 210.

At issue here, the federal kidnapping statute provides that a person convicted of kidnapping "shall be punished by death or life imprisonment" "*if the death of any person results.*" 18 U.S.C. § 1201(a) (emphasis added). The Court first observes that the statute does not contain any explicit proximate cause requirement and Parks does not argue to the contrary. The question then becomes whether such a requirement should be implied into the kidnapping statute and therefore into the Government's burden. While neither the Second Circuit nor the United States Supreme Court have addressed the requisite proof of causation regarding the "death results" enhancement in the context

of § 1201, the Court is not without guidance.[14] In *United States v. Felder*, 993 F.3d 57 (2d Cir. 2021), the defendant appealed his conviction for the crime of "Carjacking Resulting in Death" in violation of 18 U.S.C. § 2119(3). As this Court did in the trial of this matter, the trial court in *Felder* had instructed the jury that the Government was required to prove that "but for" the actions of the defendant, the victim would not have died. *See id.* at 63. Section 2119 provides:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—
>
> . . .
>
> (3) *if death results*, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

18 U.S.C. § 2119(3) (emphasis added).

On appeal, the defendant argued that the trial court's jury instruction was error insofar as it did not include a proximate cause instruction, to wit, a charge that the victim's death must have been reasonably foreseeable to him. *Felder*, 993 F.3d at 68–69. After a lengthy and detailed analysis, the Second Circuit, though acknowledging the *Burrage* Court's discussion of the issue, rejected the defendant's argument. *See id.* at 69–71. The court first observed that the defendant's argument "finds some support in basic principles of criminal law, which have 'long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause.'" *Id.* at 68 (quoting *Burrage*, 571 U.S. at 210). It also acknowledged that "[w]hen a crime requires 'not

---

[14] The Court observes that courts outside of this circuit have held, or at least implied, that the Government need only demonstrate but-for causation—or no causation at all—in order for a jury to convict a defendant of kidnapping resulting in death in violation of Section 1201(a). *See, e.g., United States v. Rodriguez-Santos*, 56 F.4th 206, 215 (1st Cir. 2022) (noting that the term "results," as used in the context of section 1201(a), "means that the kidnapping is a but-for cause of the death" (quoting *United States v. Ross*, 969 F.3d 829, 838 (8th Cir. 2020), *vacated in part*, No. 18-2800, 2022 WL 4103064 (8th Cir. Sept. 7, 2022))); *Camacho v. Eng.*, 872 F.3d 811, 814 (7th Cir. 2017) ("[W]e are not persuaded that *Burrage*'s 'but-for' causation requirement applies to 18 U.S.C. § 1201(a).").

merely conduct but also a specified result of conduct,' a defendant generally may not be convicted unless his conduct is 'both (1) the actual cause, and (2) the "legal" cause (often called the "proximate cause") of the result.'" *Id.* at 69 (quoting *Burrage*, 571 U.S. at 210). However, the court went on to conclude that *Burrage* provided "no further guidance relevant here" because "the Supreme Court addressed only the 'actual cause' requirement" of the death-results enhancement in the Controlled Substances Act and, in so doing, "ruled that the phrase 'results from' had to be construed to require 'but-for causation' and not simply contributory causation as urged by the government." *Id.* Because the Supreme Court reversed on that ground, the Court did not reach the second question on which certiorari had been granted, to wit, whether "the phrase 'results from' further required a jury to be 'separately instruct[ed]' to decide whether the victim's death 'was a foreseeable result of the defendant's drug-trafficking offense.'" *Id.* (quoting *Burrage*, 571 U.S. at 208)*. The Second Circuit continued:

> Both before and after *Burrage*, however, every court of appeals to address the question has concluded that § 841(b) does not require proof that the resulting death was reasonably foreseeable.

*Id.* (collecting cases). The Second Circuit then discussed the Tenth Circuit's opinion in *United States v. Burkholder*, 816 F.3d 607 (10th Cir. 2016), explaining:

> The Tenth Circuit decision in *Burkholder* detailed the reasoning informing these decisions. Starting with the statutory text, *Burkholder* highlighted Congress' use of the phrase "results from" rather than "causes," observing that "resulting in death and causing death are not equivalents." The court explained that "[g]enerally, . . . the ordinary meaning of 'results from' imposes a requirement of actual or but-for causation"—the *Burrage* conclusion—"and not proximate causation." Next, the Tenth Circuit noted Congress' use of the passive voice in the phrase "results from," a choice that generally "evinces a concern with 'whether something happened—not how or why it happened.'" The court then cited to Congress' explicit inclusion of proximate-cause language in various other statutory penalty enhancements and concluded therefrom that the omission of such language from § 841(b) (the statute at issue) was intentional. Finally, the court noted that

Congress added the death-results-from provision in § 841(b)(1)(E)(i) after courts of appeals had uniformly held identical language in § 841(b)(1)(C) not to require a finding of foreseeability or proximate cause. Mindful that Congress is presumed to be aware of a statute's interpretation when it amends the statute, the Tenth Circuit concluded in *Burkholder* that Congress' enactment of § 841(b)(1)(E)(i) "without codifying therein a proximate-cause requirement strongly suggests that Congress intentionally eschewed such a requirement." This conclusion was reinforced by Congress' subsequent amendments to § 841(b), which left the language of § 841(b)(1)(E) untouched.

To be sure, *Burkholder* . . . [was] discussing a death-results-from enhancement in the Controlled Substances Act, not the death-results-from enhancement in the federal carjacking statute. **But *Burkholder*'s reasoning applies as much in the latter context as in the former and we therefore adopt it as our own in concluding that the district court did not err in charging the jury of the need to find but-for causation as to the carjacking victims' deaths, without further charging that the deaths must have been reasonably foreseeable to the defendant.**

*Id.* at 69–70 (emphasis added) (internal citations and footnote omitted).

The Court sees no basis upon which to distinguish *Felder* from the instant case. Indeed, Section 2119(3)'s "if death results" language is materially indistinguishable from Section 1201(a)'s "if the death of any person results" language. The *Felder* court's analysis therefore has equal application to the kidnapping statute at issue here, which evinces the identical intent of Congress to address "whether something happened—not how or why it happened." *Id.* at 70.

### Counts One and Two—Due Process

As discussed above, in the charge to the jury on the fifth element—"that the Defendant's acts resulted in the death of the victim"—of Counts One and Two, the Court instructed the jury that "the Government must prove beyond a reasonable doubt that but for the Defendant's actions, [the victims] would not have died." Jury Instr. at 11. The parties further requested that the charge for these Counts contain the Government's theory of the case: that the but-for causation requirement of Section 1201(a) was satisfied because Parks shot and killed Connor and Lawrence.

During the Charging Conference, the Court made clear that it did not believe the jury had to find that Parks was the person who shot and killed the victims in order to convict him on Counts One and Two. Notwithstanding, the parties requested that the jury be instructed that "[h]ere, the Government asserts that the Defendant shot and killed [the victims]." *Id.*

During deliberations, the jury submitted a note, which read:

> Per page 11 paragraph 5 [the portion of the jury charge setting out the fifth element of Counts One and Two], to prove this element, is it necessary that the Government's assertion in the last sentence of the second section be the only way to satisfy the requirement of the Defendant's actions resulting in the deaths in Counts One and Two?

Jan. 18 Trial Tr. at 123:22–124:1.

As the Court had already discussed with the parties at the Charging Conference, the simple answer to the question was "no." However, as neither the Government (in light of its theory) nor Parks (in light of the Government's theory) had advanced any arguments in this regard, the Court dismissed the jury for the evening and provided the parties with the opportunity to advance arguments as to how it should respond to the note. That evening, the Court directed counsel to review three cases it had located that confronted similar issues. *See United States v. Civelli*, 883 F.2d 191 (2d Cir. 1989) (approving a trial court's use of a supplemental jury instruction on conscious avoidance after the jury inquired as to whether the defendant could be found guilty of a narcotics offense if the defendant suspected he was carrying narcotics but did not look inside the package he was transporting); *United States v. Martinez*, 419 F. App'x 34 (2d Cir. 2011) (affirming the trial court's answer of "no" when the jury sent a note inquiring whether it was necessary to "put an actual smoking gun in [the defendant's] hand to find him guilty of [the killing]"); *United States v. Hannah*, 97 F.3d 1267 (9th Cir. 1996) (affirming the trial court's use of a supplemental aiding and abetting instruction where the court provided the parties the opportunity to present additional argument on the new theory). The Government provided the Court and defense counsel

19

with additional cases, while the defense submitted a written memorandum arguing that responding to the jury's note in the negative would violate both Federal Rule of Criminal Procedure 30 and Parks' due process rights. *See* Def.'s Resp. Re: Juror Question at 3–6, ECF No. 116.

After hearing argument from both parties the next morning, the Court concluded that the appropriate response was to follow a procedure utilized by other courts by answering the jury's note with the legally correct answer and allowing additional closing arguments so the parties could address Parks' guilt if the jury was not convinced that he was the shooter. After further discussion with counsel, the Court gave the following supplemental instruction:

> The short answer to this inquiry is No. Let me repeat and supplement this charge. The Government must prove that the victim is deceased and that his death resulted from the willful and intentional conduct of the Defendant. To establish that the Defendant's conduct resulted in the death of the victim, the Government must prove beyond a reasonable doubt that but for the Defendant's actions, the victim would not have died.
>
> The Defendant's action is conduct on the part of the Defendant that he voluntarily undertakes.

Jan. 19 Trial Tr. at 28:13–29:3.

After providing the parties time to craft their arguments accordingly, the Court allowed the parties six minutes of additional argument (a time that was requested by defense counsel). In those supplemental arguments, the Government maintained its theory that it had met its burden of proving that Parks' actions were the but-for cause of the victims' deaths because he himself shot and killed the victims. Although the Government did acknowledge, consistent with the Court's supplemental instruction and with the law, that this was not the only way to find that the causation element was satisfied, the Government maintained that "the Defendant is the one that killed Damian Connor . . . [and] Tamar Lawrence," and that the jury should find the causation element "satisfied based on that evidence." Jan. 19 Trial Tr. at 29:20–30:4. The Government did not offer

any alternative factual basis upon which the jury could or should convict Parks. Counsel for Parks focused the additional argument on whether the kidnapping was over by the time the victims were killed, thereby breaking the necessary chain of causation.

Parks now seeks a new trial in light of the Court's supplemental instructions, arguing that the instructions were both legally incorrect and that his due process rights were violated by allowing the jury to convict on a theory never argued by the Government. *See* Def.'s Mem. in Supp. at 19. Finally, Parks asserts that the Court's failure to include an interrogatory in this regard precludes the defense from assessing and determining whether Parks was prejudiced by the supplemental instruction to the extent that the jury may have convicted him on a theory other than that he shot and killed the victims. *Id.* The Government responds that Parks' due process rights were not violated by the supplemental instruction because it advanced a consistent theory of the case throughout the trial—including during supplemental arguments after the jury had been instructed that Parks need not be the person to have shot and killed Connor and Lawrence to be convicted. *See* Gov.'s Mem. in Opp'n at 37, ECF No. 160. The Government further argues that neither the Federal Rules nor Parks' due process rights precluded the Court from responding to the jury's inquiry with a legally correct answer that directly addressed the jury's question. *See id.* at 38–40.

The Court agrees with the Government.

Parks first contests the correctness of the supplemental instruction on the same basis as he challenged the original jury instructions, arguing that it was legally incorrect because it failed to include an instruction as to proximate causation. *See* Def.'s Mem. in Supp. at 23–25. As discussed above, the Government was not required to prove proximate cause and therefore the supplemental instruction was legally correct.

21

Parks next argues that the Court's response to the jury's question and supplemental instruction violated his due process right to a fair trial. *See id.* at 20–23. He asserts that "[f]ew constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused." *See id.* at 20 (quoting, *inter alia*, *Eaton v. Tulsa*, 415 U.S. 697, 698–99 (1974) (per curiam)). He therefore argues that the Government's adherence to a "theory of principal liability"—that Parks, himself, shot and killed the victims—precluded the Court from instructing the jury on a different "theory of liability" in response to the jury's direct inquiry. *See id.* at 19–22.

As an initial matter, the Court observes that the cases cited by Parks in support of his argument are inapposite. For example, *Dunn v. United States*, 442 U.S. 100, 106–07 (1979), cited by Parks for the proposition that allowing the Government to advance another theory of liability at the end of trial "offends the most basis notions of due process," *see* Def.'s Mem. in Supp. at 20, concerned the Government's advancement of a new theory of liability *on appeal.* And the Government in *Dunn* only advanced the new theory *after* the theory upon which the defendant was convicted at trial was found to be legally deficient. *See* 442 U.S. at 107 ("The jury might well have reached the same verdict had the prosecution built its case on [the alternative theory]. . . . [But] appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial."); *see also Cole v. State of Ark.*, 333 U.S. 196, 197–98 (1948) (reversing a judgment where the petitioners were charged and convicted for a violation of one section of a state statute but the State Supreme Court affirmed their convictions on the ground that the evidence showed that the petitioners violated a different section of the statute describing a separate and distinct offense). The Court has no quarrel with the notion that a conviction cannot be upheld on the basis of an alternative legal theory never put forth to the jury,

but that is not this case. *Cf. United States v. Garcia*, 992 F.2d 409, 416 (2d Cir. 1993) (holding that, where two out of three means for committing extortion charged to the jury were legally insufficient, and there was no way to tell on which theory the jury convicted, the defendant's conviction must be overturned). Here, the question of whether Parks, as a factual matter, had to have been the person to shoot and kill Connor and Lawrence in order to be convicted of Counts One and Two was raised by the Court at the Charging Conference and thereafter by the jury during deliberations. And, as discussed at the Charging Conference and confirmed to the jury, the legally accurate answer to the question was that Parks did not.[15] Notwithstanding, Parks requested that the jury be instructed contrary to the law—that the jury must find that Parks shot the victims in order to convict him. However, "no defendant is entitled to an instruction that incorrectly states the law." *United States v. Cheek*, 882 F.2d 1263, 1269 (7th Cir. 1989), *vacated on other grounds*, 498 U.S. 192 (1991).

Parks nevertheless argues that by not confining the Government's burden of proof to the Government's factual theory of liability, he was denied his due process right to a fair trial.

Although a trial court has broad discretion to give a supplemental jury instruction, "the effect on the trial of a supplemental instruction must be examined carefully because 'a defendant must have an adequate opportunity to argue his innocence under the district court's instructions in order to be assured a fair trial.'" *United States v. James*, 998 F.2d 74, 78 (2d Cir. 1993) (quoting *United States v. Horton*, 921 F.2d 540, 546–47 (4th Cir. 1990)). Parks correctly observes that "Courts abhor trial by ambush," Def.'s Resp. Re: Juror Question at 4, and a defendant's due

---

[15] "When 'a jury makes explicit its difficulties [through a written inquiry,] a trial judge should clear them away with concrete accuracy.'" *United States v. Castelin*, No. 3:11-CR-183 (JCH), 2013 WL 3540052, at *2 (D. Conn. July 10, 2013) (quoting *Bollenbach v. United States*, 326 U.S. 607, 612–13 (1946)), *aff'd*, 597 F. App'x 22 (2d Cir. 2015). "Moreover, '[i]f a supplemental charge is legally correct, the district court enjoys broad discretion in determining how, and under what circumstances, that charge will be given.'" *Id.* (quoting *Civelli*, 883 F.2d at 195).

process rights may be violated where the Government improperly advances evidence or a theory of the case to which the defendant was not provided time to respond, *see Perez v. McIntosh*, No. 21-CIV-7339 (ER) (GWG), 2022 WL 4229257, at *6 (S.D.N.Y. Sept. 14, 2022) ("A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence. Indeed, such notice is essential to a defendant's ability to present his defense without being taken by surprise by evidence offered at trial.'" (cleaned up)).

However, Parks cannot rightfully complain that he was unfairly surprised by the jury's inquiry or the Court's response.[16] The Court's response to the jury's inquiry did not suggest a new "theory of liability" that allowed the jury to find Parks guilty as an aider and abettor of kidnapping resulting in death rather than as the principal.[17] Rather, the supplemental instruction reflected the Court's understanding that, to be held *principally* liable for the crime of kidnapping resulting in death, the jury need only find that Parks' actions were the but-for cause of the victims' deaths. The supplemental instruction was entirely consistent with the original causation charge. *Cf. United States v. Benson*, No. 04 CR 493, 2006 WL 2520612, at *13 (E.D. Pa. Aug. 22, 2006) (finding that a supplemental instruction did not present a new theory of criminal liability where it "did not introduce a lower burden for the government than had already been articulated in the original jury instructions"), *aff'd*, 280 F. App'x 149 (3d Cir. 2008); *Chill v. Hughes*, No. CV-1503558 (PSG) (AFM), 2016 WL 5844176, at *15 (C.D. Cal. Sept. 1, 2016) ("The trial judge's supplemental

---

[16] It is worth noting that the Indictment does not allege that Parks caused the deaths of Connor and Lawrence by shooting them; it merely alleges that Parks kidnapped each victim and that the kidnapping resulted in the death of each victim.

[17] Even if the instruction did allow Parks to be convicted on an aiding and abetting theory, which it did not, courts have routinely held that this in and of itself does not violate due process. *See, e.g.*, *United States v. Rosario*, No. 09-CR-415-2 VEC, 2015 WL 518217, at *3 (S.D.N.Y. Feb. 9, 2015) ("In cases in which the defendant was on notice of the possibility of conviction based on an aiding and abetting theory, the Circuit has affirmed as reasonable the decision to respond accurately to juries' questions, even if the Government did not try the case on that theory." (collecting cases)).

instruction in this case—which was part of the original jury instruction on causation that had already been given to the jury—merely clarified the existing concept of causation, rather than introduced a new theory to the case." (internal citation omitted)), *report and recommendation adopted*, No. CV1503558PSGAFM, 2016 WL 5842184 (C.D. Cal. Oct. 3, 2016).

To the extent that the Court's response to the jury's note may have permitted the jury to consider a new theory of but-for causation that was not previously advanced by the Government, Parks' due process rights were nonetheless not violated. The Government never disavowed that Parks could be convicted even if he was not the shooter; it simply argued that he was the shooter. *Cf. James*, 998 F.2d at 79 (finding that the defendant's due process rights were not plainly abridged by a supplemental jury instruction that "did not fundamentally change the government's theory of liability" where "the government never made representations that led [the defendant] to forgo any defenses he might otherwise have asserted"); *Dell'Aera v. James*, No. 12-CV-00344 JFB, 2012 WL 6632673, at *7 (E.D.N.Y. Dec. 20, 2012) ("Although arguing that the robbery plan was pre-conceived, the prosecution never disavowed the idea that intent could have been formed at the scene, and thus petitioner cannot complain that he was unaware of this potential prosecutorial theory of the case when he formulated a defense."). And, at the Charging Conference, the Court directly alerted the parties to the fact that it did not believe that the Government had to prove that Parks was the shooter in order to be convicted of Counts One and Two. Parks thereafter made the tactical decision to frame his closing argument around the factual theory that the Government advocated at trial. *Cf. Rosario*, 2015 WL 518217, at *5 (noting that "[t]he fact that the Government attempted to convince the jury that Rosario was the gunman does not mean that Rosario could have reasonably believed that he would be acquitted if he successfully created reasonable doubt that he was the gunman" where the evidence allowed the jury to conclude that he was involved in

the crime whether or not he was the gunman); *Gracesqui*, 2016 WL 11259074, at *8 ("While Gracesqui is correct that the government's exclusive theory at trial was that Gracesqui was the shooter, he cites no law supporting his contention that the Court must have instructed the jury on the government's theory of the case when it gave the two supplemental instructions." (internal citation omitted)), *aff'd*, 730 F. App'x 25 (2d Cir. 2018). Indeed, "the jury does not have to accept the Government's case hook, line, and sinker in order to convict," and the fact that the jury may have convicted Parks on a divergent, but legally permissible theory of the case from that advanced by the Government does not mean that Parks' due process rights were violated. *See Rosario*, 2015 WL 518217, at *5 (collecting cases in support of the proposition that "juries can and often do convict defendants based on divergent and even mutually-incompatible theories of liability"); *United States v. Frazier*, No. 21-CR-30001-DWD, 2023 WL 4491450, at *9 (S.D. Ill. July 12, 2023) ("Regarding unfair surprise . . . defense counsel knew, or should have known, that the jury could receive an aiding-and-abetting instruction if warranted by the evidence.").

Finally, even if Parks were unfairly surprised by the supplemental instruction, Parks cannot show that he was prejudiced by the instruction. As indicated, prior to the Charging Conference, neither the Court nor the Government ever told Parks that he could not be convicted if he was not the shooter. Thus, Parks' claims that he would have approached the case differently had he known of the supplemental instruction are unavailing. *Cf. Rosario*, 2015 WL 518217, at *4 (noting that the defendant's claim of prejudice was undermined by the fact that "the cross-examination that Defendant argues would have been different *preceded* the announcement by the Court that it did not intend to charge on aiding and abetting"). And further reducing any prejudice or unfair surprise, the Court followed a procedure used by other courts and allowed supplemental closing arguments to address the non-shooter theory of but-for causation. *See United States v. Mapp*, 170 F.3d 328,

337 (2d Cir. 1999) (holding that, by giving [the defendant] the opportunity to respond by presenting additional evidence or argument to the jury, the district court carefully avoided causing [the defendant] any arguable prejudice in the giving of [a] supplemental instruction that allegedly changed the Government's theory of liability); *see also Horton*, 921 F.2d at 547 ("Adequate additional argument can cure any prejudice experienced as a result of supplemental instructions.").

Notably, the Government used that time to argue the same theory that it pursued for the duration of the trial—that Parks himself shot and killed the victims. *Cf. United States v. Watts*, No. 17-CR-0372-4(JS), 2020 WL 6136211, at *10 (E.D.N.Y. Oct. 19, 2020) (collecting cases discussing that the Government does not unfairly surprise a defendant where it argues the same core legal theory throughout a case), *aff'd in part and remanded*, No. 21-2925, 2023 WL 2910634 (2d Cir. Apr. 12, 2023); *United States v. Salameh*, 152 F.3d 88, 139–40 (2d Cir. 1998) (finding that the Government did not unfairly raise new theories of guilt during closing arguments where its theory of criminal liability remained consistent throughout its opening and closing statements). The defense used this time to expand upon an argument that it had already made in its prior closing—that any kidnapping that may have occurred had ended by the time the victims were killed, thereby cutting off any causal link between Parks' conduct (the kidnapping) and the victims' deaths. The jury disagreed and convicted Parks. Although Parks now argues that he would have tailored his theory of defense more by giving "greater attention" to the kidnapping allegation rather than "focusing exclusively on who actually shot and killed Connor and Lawrence,"[18] Def.'s Reply at 7, ECF No. 164, Parks does not identify any arguments that he actually would have advanced

---

[18] Parks also suggests in his Reply Memorandum that his Sixth Amendment right to effective assistance of counsel may have been violated by his counsel's inability to craft an adequate defense. *See* Def.'s Reply at 7 ("The Court's decision to give the supplemental instruction also undermined Mr. Parks's right to the effective assistance of counsel. Had there been any indication that the Government would advance additional theories of liability, defense counsel would have confronted the case differently."). However, absent specific arguments advanced regarding the Sixth Amendment right to effective assistance of counsel, or any specific claims as to how counsel would or should have argued this case differently, the Court cannot assess those claims here.

or how they would have differed from those that his counsel made during the supplemental closing arguments, *cf. Mapp*, 170 F.3d at 337 (finding that the defendant's contention "that he might have asserted additional defenses at trial if he had known that such an instruction would be given" was "unpersuasive because, even now, [the defendant] is silent as to what those defenses might be"); *United States v. Hunley*, 476 F. App'x 897, 900 (2d Cir. 2012) ("Hunley does not identify any arguments he would have made, or defenses he would have asserted, had the government emphasized its theory of joint possession earlier in the trial.").[19]

Accordingly, as the Court finds that the supplemental instruction was legally correct, was necessary to address the jury's specific inquiry, and neither violated Parks' right to due process nor unfairly prejudiced him, Parks' motion for a new trial is denied.

## CONCLUSION

For the reasons set forth herein, Parks' Motion for Judgment of Acquittal or, in the alternative, Motion for New Trial (ECF No. 149) is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 16th day of August 2023.

 /s/ Kari A. Dooley
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[19] Nor was there prejudice due to failure to include an interrogatory. The jury instructions were legally correct and, even if they allowed, as Parks contends, him to be convicted on different factual theories of liability, both of these theories were legally permissible. *Cf. Copeland-El v. United States*, No. 08-CV-1383 (FB), 2008 WL 5220829, at *1 (E.D.N.Y. Dec. 12, 2008) ("Since each of the theories submitted to the jury was valid, it is of no consequence that the jury did not specify which theory supported [the defendant's] conviction.").